1

2

3

4

5

6
## UNITED STATES DISTRICT COURT
### DISTRICT OF NEVADA
7

8   ANTHONY THOMAS CHERNETSKY,   )         3:06-cv-00252-RCJ-WGC

9                  Plaintiff,   )   **REPORT AND RECOMMENDATION**
                                 )   **OF U.S. MAGISTRATE JUDGE**
10         vs.                   )
                                 )
11   STATE OF NEVADA, et. al.    )
                                 )
12              Defendants.      )
13  _____  )

14       This Report and Recommendation is made to the Honorable Robert C. Jones, United

15  States District Judge. The action was referred to the undersigned Magistrate Judge pursuant

16  to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4. Before the court is

17  Defendants' Motion for Summary Judgment. (Doc. # 123.)[1] Plaintiff has opposed the motion

18  (Doc. # 146) and Defendants filed a reply (Doc. # 149). Also before the court is Plaintiff's

19  Motion for Summary Judgment. (Doc. # 127.) Defendants have opposed Plaintiff's motion

20  (Doc. # 145) and Plaintiff filed a reply (Doc. # 150).

21       After a thorough review, the court recommends that Plaintiff's motion (Doc. # 127) be

22  denied and that Defendants' motion (Doc. # 123) be granted in part and denied in part.

23                          **I. BACKGROUND**

24       Plaintiff Anthony Thomas Chernetsky, a pro se litigant, is a prisoner in the custody of

25  the Nevada Department of Corrections (NDOC). Defendants are: Jane Foraker-Thompson,

26  Donald Helling, Dorothy Nash Holmes, Robert LeGrand, Jack Palmer, Cheri Scott, Lenard

27

28  _____
        [1]Refers to court's docket number.

1 Vare, Glen Whorton, and the State of Nevada.

2    Plaintiff's only remaining claim is brought pursuant to the Religious Land Use and

3 Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc-1, *et. seq.*[2]

4    Plaintiff alleges that Defendants' implementation of NDOC Administrative Regulation

5 (AR) 810 has substantially burdened his ability to exercise his Wiccan faith, without furthering

6 a compelling government interest by the least restrictive means, in violation of RLUIPA. (Doc.

7 # 6.) More specifically, Plaintiff alleges that the implementation of AR 810 violates his rights

8 under RLUIPA because it prohibits him from: (1) engaging in the sweat lodge activity (also

9 referred to by Plaintiff in his complaint, briefing and supporting materials as the "Teach An

10 Alias" ritual or ritual associated with the "Star Lodge"); (2) possessing certain items of religious

11 property; (3) cooking meals on Wiccan religious grounds, including the provision of raw foods,

12 and receiving free beans, rice, flour, and oil for the preparation of meals on Wiccan religious

13 grounds; (4) using spiritual anointing oils; (5) making use of candles, incense and herbs as an

14 individual (as opposed to group use); (6) having unfettered access to reading, studying and

15 other religious materials[3]; (7) pursuing herbal medicinal practice; (8) using open fire in rituals;

16 (9) cultivating edible plants and herbs on the Wiccan religious grounds; and (10) taking days

17 off work in observance of the Wiccan holy days without a guarantee of not being terminated

18

19    [2]The screening order is set forth at Doc. # 5, and Plaintiff's complaint is set forth at Doc. # 6. Defendants

20 subsequently moved to dismiss the action, and the court treated the motion as one for summary judgment, and granted summary judgment as to all claims in favor of Defendants. (*See* Mtn. to Dismiss, Doc. # 21; Order at Doc.

21 # 37.) Plaintiff appealed. (Notice of Appeal, Doc. # 44.) The Ninth Circuit affirmed the determination that the individually named defendants were entitled to qualified immunity, but found a genuine dispute of material fact existed as to whether the State had established a compelling interest in restricting Plaintiff's religious exercise,

22 in particular his access to a sweat lodge, and whether AR 810 is the least restrictive means for furthering that interest. (Doc. # 51.) The Ninth Circuit did not address Plaintiff's constitutional claims (equal protection, due

23 process, and retaliation), because he did not raise them on appeal, but instructed the court on remand to consider whether leave to amend should be given. (*Id.*) Some years later, Plaintiff eventually sought leave to amend, but

24 the request was denied by the court, finding that because of the amount of time that had passed since the Ninth Circuit issued its opinion and when Plaintiff sought leave to amend, it would result in prejudice to Defendants and

25 would unduly delay this action. (*See* Report & Rec., Doc. 140; Order adopting, Doc. # 144.) Qualified immunity shields government officials from *civil damages*; therefore, the individual defendants named in the RLUIPA claim

26 are still named because Plaintiff seeks injunctive and declaratory relief. (*Id.*)

27    [3]Plaintiff alleges that AR 810 "effectively limits the amount of reading/study/teaching materials" he can access. (Doc. # 6 at 7.)

28                                      2

1    for doing so. (Doc. # 6 at 6-8.)

2        The court entered a scheduling order on December 27, 2012, that permitted the parties

3    to file dispositive motions. (Doc. # 83.) The parties have participated in several mediation

4    sessions and settlement conferences, but ultimately were not able to resolve this action. After

5    the latest attempt to resolve this action in September 2013 proved unsuccessful, the court

6    reinstated briefing deadlines for dispositive motions. (*See* Docs. # 123, # 137.)

7        The court now considers the parties' motions for summary judgment.

8                                **II. LEGAL STANDARD**

9        "The purpose of summary judgment is to avoid unnecessary trials when there is no

10   dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*,

11   18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). All reasonable inferences are drawn in

12   favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citing

13   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Summary judgment is

14   appropriate if "the pleadings, the discovery and disclosure materials on file, and any

15   affidavits show that there is no genuine issue as to any material fact and that the movant is

16   entitled to judgment as a matter of law." *Id.* (quoting Fed.R.Civ.P. 56(c)).[1] Where

17   reasonable minds could differ on the material facts at issue, however, summary judgment is

18   not appropriate. *See Anderson*, 477 U.S. at 250.

19       The moving party bears the burden of informing the court of the basis for its motion,

20   together with evidence demonstrating the absence of any genuine issue of material fact.

21   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Although the parties may submit

22   evidence in an inadmissible form, only evidence which might be admissible at trial may be

23   considered by a trial court in ruling on a motion for summary judgment. Fed.R.Civ.P.

24   56(c).

25

26   _____

[1]Federal Rule of Civil Procedure 56 was amended in 2010 to state: "The court shall grant summary judgment if
27   the movant shows that there is no genuine *dispute* as to any material fact and the movant is entitled to judgment
as a matter of law." (Emphasis added.) The analysis under the cases cited, however, remains the same.

28                                        3

In evaluating the appropriateness of summary judgment, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) considering that evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id*. at 248.

In determining summary judgment, a court applies a burden shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'[ ] In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 323-25. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac.*

4

1  *Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)(quotation marks and citation

2  omitted). The nonmoving party cannot avoid summary judgment by relying solely on

3  conclusory allegations that are unsupported by factual data. *Id*. Instead, the opposition

4  must go beyond the assertions and allegations of the pleadings and set forth specific facts by

5  producing competent evidence that shows a genuine issue for trial. *See* Fed.R.Civ.P. 56(e);

6  *Celotex*, 477 U.S. at 324.

7      At summary judgment, a court's function is not to weigh the evidence and determine

8  the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S.

9  at 249.  While the evidence of the nonmovant is "to be believed, and all justifiable

10  inferences are to be drawn in its favor," if the evidence of the nonmoving party is merely

11  colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-

12  50, 255 (citations omitted).

13                          **III. DISCUSSION**

14  **A. RLUIPA**

15      Section 3 of RLUIPA provides:

16      No government shall impose a substantial burden on the religious exercise of
        a person residing in or confined to an institution...even if the burden results
17      from a rule of general applicability, unless the government demonstrates that
        imposition of the burden on that person--(1) is in furtherance of a compelling
18      governmental interest; and (2) is the least restrictive means of furthering that
        compelling governmental interest.
19  42 U.S.C. § 2000cc-1(a).

20      "The Supreme Court has recognized RLUIPA as...[a] 'congressional effort[] to accord

21  religious exercise heightened protection from government-imposed burdens[.]'" *Greene* v.

22  *Solano Cnty. Jail*, 513 F.3d 982, 986 (9th Cir. 2008) (quoting *Cutter v. Wilkinson*, 544 U.S.

23  709, 714 (2005)). However, "[c]ourts are expected to apply RLUIPA's standard with due

24  deference to the experience and expertise of prison and jail administrators in establishing

25  necessary regulations and procedures to maintain good order, security and discipline,

26  consistent with consideration of costs and limited resources." *Hartmann v. Cal. Dep't. of

27  Corr.*, 707 F.3d 1114, 1124 (9th Cir. 2013) (internal quotation marks and citation omitted).

28                                    5

"Under RLUIPA, [the plaintiff] bear[s] the initial burden of persuasion on whether [a] [p]olicy 'substantially burdens' [his or her] 'exercise of religion.'" *Hartmann*, 707 F.3d at 1124 (citing 42 U.S.C. § 2000cc-2(b)). Thus, the court must begin by "identifying the 'religious exercise' allegedly impinged upon.'" *Greene*, 513 F.3d at 987. "Religious exercise" is "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). Thus, RLUIPA "bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion." *Greene*, 513 F.3d at 987 (quoting *Cutter*, 544 U.S. at 725 n. 13; 42 U.S.C. § 2000cc-5(7)(A)).

"[T]he 'exercise of religion' often involves not only the belief and profession but the performance of...physical acts [such as] assembling with others for a worship service [or] participating in sacramental use of bread and wine." *Cutter*, 544 U.S. at 720 (internal citation and quotation marks omitted); *see also Greene*, 513 F.3d at 988 (concluding group worship was the "religious exercise" at issue).

Next, the court must address "whether the prison regulation at issue 'substantially burdens' that religious exercise." *Greene*, 513 F.3d at 987. A "substantial burden" on "religious exercise" "must impose a significantly great restriction or onus upon such exercise." *Id*. (quoting *San Jose Christian Coll. V. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004)). "In the context of a prisoner's constitutional challenge to institutional policies, [the Ninth Circuit] has held that a substantial burden occurs 'where the state...denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on the adherent to modify his behavior and to violate his beliefs." *Hartmann*, 707 F.3d at 1125 (quoting *Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th Cir. 2005)) (internal quotation marks omitted). However, a prison is not required "to pay for an inmate's devotional accessories." *Cutter*, 544 U.S. at 720, n. 8 (citation omitted).

The Ninth Circuit has concluded that an "outright ban on a particular religious exercise is a substantial burden on that religious exercise." *Greene*, 513 F.3d at 989 (citations omitted) (concluding that policy of prohibiting maximum security prisoner from attending group worship services substantially burdened prisoner's ability to exercise his religion).

If the plaintiff makes a showing of a substantial burden on the exercise of his religion, the court's analysis then turns to whether the defendant has established that the burden furthers "a compelling governmental interest," and does so "by the least restrictive means." 42 U.S.C. § 2000cc-1(a), (b); *Greene*, 513 F.3d at 988. Prison safety and security have been found to constitute "compelling governmental interest[s]." *Cutter*, 544 U.S. at 725 n. 13; *Greene*, 513 F.3d at 988.

While prison administrators are "accorded deference with regard to prison security," they must establish that they "actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Greene*, 513 F.3d at 989 (quoting *Warsoldier*, 418 F.3d at 999) (internal quotation marks omitted). "[I]n light of RLUIPA, no longer can prison officials justify restrictions on religious exercise by simply citing the need to maintain order and security in a prison. RLUIPA requires more." *Id*. at 989-90.

**B. Defendants' Motion for Summary Judgment (Doc. # 123)**

**1. Effect of the Ninth Circuit's Decision**

In his opposition, Plaintiff argues that Defendants' motion is improper because the Ninth Circuit has already determined that a factual issue exists which precludes the entry of summary judgment in favor of Defendants at this time. (*See* Doc. # 146 at 3-5.)

**a. Ninth Circuit Decision**

The Ninth Circuit did conclude that there was a "genuine issue of material fact as to whether the State ha[d] established a compelling interest in restricting [Plaintiff's] religious exercise, in particular his access to a sweat lodge, and that AR 810 is the least restrictive means of furthering that interest." (Doc. # 51 at 2.) The Ninth Circuit went on to state: "The

State did not provide sufficient evidence to analyze whether the prison's application of AR 810 is the least restrictive means available to advance a compelling state interest." (*Id*. at 2-3.) Thus, the Ninth Circuit vacated summary judgment for Defendants, and remanded for further proceedings. (*Id*. at 3.)

The Ninth Circuit did *not* finally determine, as Plaintiff implies, that AR 810 is not the least restrictive means; only that there was not sufficient evidence to determine that summary judgment should be entered in Defendants' favor.

### b. Successive Motions for Summary Judgment are Permissible

Rule 56 does not limit the number of summary judgment motions that may be filed, and allows for exceptions to default time limits to be made by local rule or court order. Fed. R. Civ. P. 56(b). The Ninth Circuit has held that "district courts have discretion to entertain successive motions for summary judgment, independent of whether the motions involve qualified immunity." *Hoffman v. Tonnemacher*, 593 F.3d 908, 911 (9th Cir. 2010). Such motions may foster the "'just, speedy, and inexpensive' resolution of suits." *Id*. (quoting Fed. R. Civ. P. 1.). Successive motions are "particularly appropriate on an expanded factual record." *Id*. The motion "can potentially save all concerned the far greater expense of a trial." *Id*. at 912. To avoid abuse of the procedure, however, courts retain discretion to weed out frivolous or simply repetitive motions. *Id*. at 911.

The scheduling order issued by the court on December 27, 2012 specifically allowed the parties to file dispositive motions. (Doc. # 83 at 2.) And in fact, after the court granted several requests for an extension of the dispositive motion deadline, Defendants and Plaintiff filed their respective motions. (Doc. # 123, Doc. # 127.) Plaintiff never asserted any objection to the dispositive motion provision of the scheduling order. Thus, the court finds Defendants were permitted to file a successive motion for summary judgment in order to addresses the deficiencies highlighted by the Ninth Circuit in their original motion.

### c. Res Judicata Principles Do Not Apply to this Situation

Finally, the court rejects Plaintiff's argument that this motion is improper because of

8

the application of res judicata principles. "The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'" *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). Res judicata "protects 'against the expense and vexation attending multiple lawsuits, conserve[s] judicial resources, and foster[s] reliance on judicial action by minimizing the possibility of inconsistent decisions.'" *Id.* at 892 (citation omitted). Claim preclusion bars successive litigation of the same claim after a final judgment has been entered. *See id.* Issue preclusion, on the other hand, "bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Id.* (citation omitted). Both involve the effect of a prior *judgment*. *See id.* Here, there has been no final judgment. Therefore, the principles of res judicata do not apply to the Ninth Circuit's decision previously issued in this case.

### d. Conclusion

In sum, the court rejects Plaintiff's argument that the Ninth Circuit has finally determined the remaining issues in this case or that Defendants were otherwise precluded from filing a successive motion for summary judgment. By virtue of its issuance of the scheduling order permitting dispositive motions (by both parties), the court has determined that Defendants should be given another chance to demonstrate they are entitled to summary judgment as a matter of law. Should they be successful, it would save the litigants and court considerable time and expense associated with conducting a trial. Plaintiff was likewise afforded an opportunity to establish that he is entitled to summary judgment, and has filed his own motion. Whether Defendants have in fact corrected the deficiencies identified by the Ninth Circuit and are entitled to summary judgment is addressed below. *See Hoffman*, 593 F.3d at 912 (denial of successive motion does not necessarily mean the district court should not allow the filing of the successive motion in the first place).

///

///

**2. Sweat Lodge Access**

**a. Effect of *Fletcher v. Whorton*, No. 2:06-cv-00818-PMP-GWF**

**i. Summary of Argument**

Defendants maintain that Plaintiff cannot prevail on his RLUIPA claim related to Wiccan access to the sweat lodge because this issue has already been adjudicated with respect to the Wiccan faith group in *Fletcher v. Whorton*, No. 2:06-cv-00818-PMP-GWF. (Doc. # 149 at 3-5.)

Defendants claim that in *Fletcher*, the plaintiff asserted virtually the same claims as Plaintiff is advancing in this action, and the court granted summary judgment in favor of defendants on his claims regarding the possession of religious property, reading materials, herbs, incense and work proscription days. (Doc. # 149 at 4.) While some other claims were resolved via settlement in *Fletcher*, the claims related to use of the sweat lodge and the ability to cook raw food over an open fire went to trial, where the court found in favor of NDOC, concluding that the defendants had demonstrated a compelling state interest supporting the restrictions imposed. (*Id*.) Therefore, Defendants claim that issue preclusion warrants entry of summary judgment on their claims in this case.

Plaintiff, on the other hand, maintains that *Fletcher* was decided under different circumstances, and the finding against the plaintiff was first based on the fact that he had failed to exhaust his administrative remedies on the sweat lodge and raw food claims.

**ii. Summary of *Fletcher***

In *Fletcher*, the inmate plaintiff was a practitioner of the Wiccan faith, who at the time of trial alleged that his rights under RLUIPA had been violated when the prison rejected the plaintiff's request to build and use a sweat lodge at High Desert State Prison, and when they rejected his requests to obtain and cook raw meat. (*See* 2:06-cv-00818-PMP-GWF at Doc. # 115 pp. 1-2.) Following a bench trial, the court issued findings of fact and conclusions of law stating first that Plaintiff had failed to exhaust his administrative remedies with respect to his sweat lodge claim, relieving NDOC of the burden of

10

establishing a compelling interest served in the least restrictive manner by placing
restrictions on Fletcher's religious practices. (*See* 2:06-cv-00818-PMP-GWF at Doc. # 115,
pp. 4.)

Despite that finding, the court went on to state that Fletcher had failed to prove that
denial of a sweat lodge placed a substantial burden on the exercise of his religion, and that
the evidence at trial showed it did not. (*See* 2:06-cv-00818-PMP-GWF at Doc. # 115 at 4-5.)
Then, even assuming that Fletcher's religious practice was substantially burdened as a
result of the sweat lodge restriction, the court said that NDOC demonstrated a compelling
state interest supporting the imposed restrictions. (*Id.*) The court pointed to the substantial
cost NDOC would have to incur in accommodating Fletcher's request for construction and
use of a sweat lodge**,** and even if constructed, access to the sweat lodge would pose a threat
to the safety and security of inmates and staff. (*Id.*)

### iii. The Decision of One District Court is Persuasive, and Not Controlling Authority

Preliminarily, the court points out that *Fletcher,* a decision made by one district
court judge,  is not binding authority on another district court judge. In other words, while
*Fletcher* may be relevant as persuasive authority, it does not bind any other court within
this district. *See, e.g., Hart v. Massanari*, 266 F.3d 1155, 1163, 1174 (9th Cir. 2001). That
being said, the court has great respect for Judge Pro, and all of the judges that make up this
district, and will of course carefully review and consider the facts and evidence presented as
well as the court's analysis in *Fletcher*. However, the court must engage in a similarly
thorough analysis of the facts and evidence presented in *this* case in making a
determination of whether Defendants are entitled to summary judgment.

### iv. Issue Preclusion Does Not Apply

The court also rejects Defendants' argument that issue preclusion applies under
these circumstances. As was indicated above, issue preclusion "bars 'successive litigation of
an issue of fact or law actually litigated and resolved in a valid court determination essential

to the prior judgment,' even if the issue recurs in the context of a different claim." *Taylor*, 553 U.S. at 892 (citation omitted. However, as the Supreme Court stated: "[i]t is a principle of general application of Anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Taylor*, 553 U.S. at 884 (internal quotation marks and citation omitted). Plaintiff was not a party to the *Fletcher* case, and while issue preclusion can be applied against a person who was not a party to the prior case under certain circumstances, none of those circumstances, as announced by the Supreme Court in *Taylor,* appears to apply here.

The Ninth Circuit previously determined that when a person was not a party to a prior lawsuit, under certain circumstances the non-party to the first suit could still be bound by the determination made in that lawsuit under the notion of privity, and that privity extended to include a concept referred to as "virtual representation." *See Adams v. Cal. Dep't. of Health Serv.*, 487 F.3d 684, 691. This concept is described as encompassing the situation where the parties to the two suits are not the same but have "an identity of interests" and were adequately represented in the first suit. *See id.* at 691. The Supreme Court, however, has since rejected "virtual representation" as a basis for finding privity. *See Taylor*, 553 U.S. at 893-95.

Instead, the Supreme Court identified six exceptions to the general rule that a nonparty's cannot be bound by preclusion: (1) "[a] person who agrees to be bound by the determination of issues in an action between others is bound in accordance with the terms of his agreement"; (2) "pre-existing 'substantive legal relationship[s]' between the person to be bound and a party to the judgment"[2]; (3) "'in certain limited circumstances,' a nonparty may be bound by a judgment because she was 'adequately represented by someone with the

---

[2] "Qualifying relationships include, but are not limited to, preceding and succeeding owners of property, bailee and bailor, and assignee and assignor." *Id.*  at 894.

12

same interests who [wa]s a party' to the suit"[3]; (4) "a nonparty is bound by a judgment if she 'assume[d] control' over the litigation in which that judgment was rendered"; (5) "a person who did not participate in litigation later brings suit as the designated representative of a person who was a party to the prior adjudication"; and (6) "in certain circumstances a special statutory scheme may 'expressly foreclos[e] successive litigation by nonlitigants…if the scheme is otherwise consistent with due process." *Id.* at 893-95 (internal citations omitted).

There is no evidence Plaintiff agreed to be bound in *Fletcher*. Nor does it appear Plaintiff and Fletcher had a substantive relationship described in the second category. This does not seem to be a case that falls into the realm of Plaintiff being "adequately represented" in the prior case, as the Supreme Court has defined it. There is certainly no evidence that Plaintiff assumed control of the litigation in *Fletcher*. Finally, no special statutory scheme seems to apply to this proceeding. Accordingly, summary judgment is not appropriate on issue preclusion grounds.

### v. Conclusion

Upon finding that issue preclusion does not apply to this case, the court will carefully review and consider the determinations made by Judge Pro in *Fletcher*, but will also thoroughly consider and apply the arguments and evidence presented by these Defendants and this Plaintiff, in analyzing whether or not summary judgment is appropriate.

### b.Religious Exercise & Substantial Burden

Plaintiff has the initial burden under RLUIPA of identifying the religious exercise that is allegedly being  impinged upon, and then of demonstrating that religious exercise was substantially burdened.

Defendants argue that Plaintiff cannot establish the prohibition substantially burdened his religious exercise because the ritual is not a mandatory tenet of the Wiccan

---

[3] This includes "properly conducted class actions, and suits brought by trustees, guardians, and other fiduciaries[.]" *Id* at 894-95 (internal citations omitted).

faith. (Doc. # 123 at 14, Nash Holmes Decl. at Doc. # 123-3 at 8 ¶ 26.)

Plaintiff, on the other hand, maintains that engaging in this religious activity is a part of the Wiccan faith, and that it is and has been a part of his faith experience. (Doc. # 146 at 19.) He provides his own declaration as well as that of another Wiccan inmate, that the use of the sweat lodge is central to their religious experience, and without access to the sweat lodge, he and other Wiccans have been unable to have a religious experience. (Doc. # 146 at 19-20; Doc. # 146-2 at 3-8; Doc. # 146-2 at 23-25.) To support his position, he also submits excerpts from several texts that include a discussion regarding pagan groups' use of the sweat lodge. (Doc. # 146 at 31-57, Doc. # 146-1 at 37-74.)

Plaintiff also submits a memorandum from defendant Chaplain Jane Foraker-Thompson, where she describes discussions she had with "experts" of the Wiccan faith. (Doc. # 146-1 at 17-19.) While she initially states that the "experts" told her that Wiccans and other pagan religions did not normally observe the sweat lodge ritual, she acknowledges that when she interviewed Wiccan inmates at NDOC facilities she was told that "there are a thousand ways of Wicca." (*Id.*)

 While Defendants have raised some question as to whether use of the sweat lodge is a central practice of the Wiccan faith, this is immaterial. Under RLUIPA, "religious exercise" is broadly defined to include "*any* exercise of religion, *whether or not compelled by, or central to*, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A) (emphasis added). As Judge Pro pointed out in his order denying summary judgment on the sweat lodge claim in *Fletcher*, "what most Wiccans do is not at issue[.]" (*See* 2:06-cv-000818-PMP-GWF at Doc. # 30 p. 11:22.) Instead, Plaintiff's sincere beliefs as to what makes up his religious exercise are at issue.

Plaintiff has tendered evidence that participation in the sweat lodge ritual is a religious exercise for purposes of RLUIPA, and as such has at the very least raised a genuine dispute of material fact as to this element of his claim.

The court now turns to the question of whether AR 810's prohibition on access to the

1   sweat lodge substantially burdened Plaintiff's ability to exercise his religion. In *Greene*, the

2   Ninth Circuit made clear that an "outright ban on a particular religious exercise is a

3   substantial burden on that religious exercise." *Greene*, 513 F.3d at 989. Here, Plaintiff

4   asserts that Defendants, through AR 810, have effectuated an outright ban on Wiccan

5   access to the sweat lodge. Therefore, he has met his prima facie burden of tendering

6   evidence that Defendants' have substantially burdened his religious exercise in precluding

7   him from accessing the sweat lodge.

8   **C. Compelling Governmental Interests & Least Restrictive Means**

9   The court's inquiry now turns to whether AR 810's prohibition on Wiccan access to

10   the sweat lodge is supported by compelling governmental interests and is the least

11   restrictive means of furthering those interests.

12   As indicated above, safety and security of the institution have been found to

13   constitute compelling governmental interests. *See Cutter*, 544 U.S. at 723, 725 n. 13;

14   *Greene*, 513 F.3d at 986. Additionally, the need to balance those concerns against

15   "consideration of costs and limited resources" may also inform the court's analysis. *Cutter*,

16   544 U.S. at 723 (internal quotation marks and citation omitted).

17   **i. Defendants' Argument**

18   Here, Defendants advance the same safety and security and cost concerns that were

19   advanced in *Fletcher*. (*See* Doc. # 123 at 14-15 ("while the *Fletcher*, case addressed the

20   construction of a sweat lodge at HDSP, the institution where Plaintiff is now incarcerated,

21   the same financial and safety and security considerations are applicable, regardless of the

22   institution."))

23   In support of their position, Defendants have submitted the declarations of

24   defendant Dorothy Nash Holmes and Deputy Director E.K. McDaniel. (Doc. # 123-3 at 2-9;

25   Doc. # 123-3 at 11-18 .) Ms. Nash Holmes' declaration appears to be the same one that was

26   submitted in support of Defendants' original dispositive motion in this action. (*Compare*

27   Doc. # 12-3 at 2-9 with Doc. # 22 at 24-31.) Ms. Nash Holmes first states that AR 810 is a

28

policy governing the practice of religious and spiritual beliefs by inmates incarcerated within NDOC. (*Id*. at 2 ¶ 3.) AR 810 provides a "Faith Group Overview" which "summarizes the diets, holy days, worship practices, and allowable items (both personal and group) of the various Faith Groups recognized by NDOC." (*Id*. ¶ 4.) These summaries are set forth in the "Faith Group Overview Chart" which is an attachment to AR 810. (*Id*. at 3 ¶ 6.)[4] Ms. Nash Holmes goes on to state that the aim of AR 810 is to accommodate various faith groups being mindful of reasonable budgetary and security constraints. (*Id*. ¶ 7.)

Deputy Director McDaniel similarly states that through AR 810, NDOC seeks to accommodate inmates' religious needs within reasonable budgetary and security constraints. (McDaniel Decl. at Doc. # 123-3 at 15 ¶ 9.) He claims that accommodation of religious faith group needs imposes significant financial costs on NDOC including money for special dietary needs and manpower costs for supervising, securing and escorting inmates before, during and after group worship or special events. (*Id*. ¶ 12.) He generally states that "security concerns and operational logistics are implicated during any activity where inmates gather in groups, including for religious or spiritual events." (*Id*. ¶ 13.)

Regarding the sweat lodge, Mr. McDaniel states: "NDOC does not approve the construction of sweat lodges for non-Native American faith groups based upon the legitimate safety and security concerns associated with monitoring the activities of inmates while participating in the sweat lodge ceremony and the financial expense in accommodating the construction of multiple sweat lodges at each institution." (*Id*. at 17 ¶ 24.)

### ii. The Nash Holmes and McDaniel Declarations Merely Assert Generalized Concerns of Safety, Security & Cost

First, while the court recognizes that safety and security have been recognized as

---

[4]The categories summarized in the chart include: the faith group, diet consideration and fast days, recognized holy days and unpaid work proscription days, personal and group worship practices, allowable personal religious items, and allowable group religious items.

valid compelling interests, and that under the right circumstances, even cost could be considered a compelling interest, the declarations submitted in support of Defendants' motion only provide the court with generalized statements regarding safety and security concerns. Neither the declaration of Ms. Nash Holmes nor that of Deputy Director McDaniel specifically addresses the actual safety and security concerns attendant to Wiccan use of the sweat lodge. Mr. McDaniel simply states that "security concerns and logistics are implicated during any activity where inmates gather in groups, including for religious or spiritual events." (McDaniel Decl. at Doc. # 123-3 at 15 ¶ 13.) He also generally references safety and security concerns associated with monitoring inmates participating in the sweat lodge ceremony, but does not discuss any specific concerns. (*Id*. at 17 ¶ 24.) Nor does he explain how these safety and security concerns, which presumably also apply to Native American use of the sweat lodge, are alleviated with respect to the Native Americans.

The concerns with cost are similarly expressed in generalized terms by these declarants; there is no specific discussion regarding costs associated with Wiccan access to the sweat lodge. Defendants merely state that NDOC incurs costs associated with accommodating the different faith groups imprisoned within their facilities, and such costs include "manpower costs related to supervising, securing, and escorting inmates immediately before, during, and after group worship services or special feast events." (Nash Holmes Decl. Doc. # 123-3 at 3 ¶ 6; *see* similar statement in the McDaniel Decl. at Doc. # 123-3 at 15 ¶ 12.)

### iii. The Post-Trial Points & Authorities in *Fletcher*

In their motion, as indicated above, Defendants do summarize the safety, security, and cost concerns that were articulated in *Fletcher,* and claim they apply equally here. (*See* Doc. # 123 at 14:18-27.) They state that at trial in *Fletcher*, NDOC presented evidence that the administration had analyzed the cost in fiscal terms and resource allocation for the allowance of sweat lodges for Wiccans, for staff time to accommodate additional group meetings, that there were no less restrictive means to assure the safety of inmates in the

17

1   sweat lodge during worship times, that Wiccans do not require sweat lodges, that sweat

2   lodges would allow for gangs, drug deals, weapon construction and fights to occur without

3   observation by correctional staff, that visualization of inmates is essential to basic security

4   of the institution, and as such the sweat lodge poses a substantial safety and security threat.

5   (*Id.*)

6          Defendants do not provide the transcripts of testimony given in *Fletcher*. Instead,

7   they merely point the court to the defendants' post-trial memorandum of points and

8   authorities in that case. (*See* Doc. # 123 at 14:26-27.) This document contains the

9   *defendants' summary* of what happened at trial. (*See* 2:06-cv-00818-PMP-GWF at Doc. #

10  108.)

11         The summary states that then Deputy Director Lori Bagwell testified that NDOC

12  analyzed the cost in fiscal terms and resource allocation for the allowance of sweat lodges

13  for Wiccans and concluded that the staff time to accommodate even 10 additional group

14  meetings would increase the budget of each institution by roughly $300,000 per year per

15  institution—an increase in NDOC's budget of approximately $2.4 million. (*See  See* 2:06-cv-

16  00818-PMP-GWF at Doc. # 108 at 4:3-10.)[5]

17         The summary also states that Ms. Bagwell testified that "no alternatives to 'sweat

18  lodges' existed as transparent coverings or cameras would be obscured by steam, officers

19  would not be permitted in the lodge during worship times and nothing else existed or was

20  suggested by the inmates that would allow for both steam and observation of inmates by the

21  institution's correctional officers." (*Id.* at 4:11-15.)

22  ///

23  ///

24  ///

25  ///

26  _____

27         [5]This document was filed in 2009.

28                                          18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**iv. A Genuine Dispute of Material Fact Remains as to Whether the Prohibition on Access to the Sweat Lodge is Supported by Compelling Governmental Interests that are the Least Restrictive Means of Furthering Those Interests**

While Defendants' post-trial summary may serve as some evidence that AR 810's prohibition on Wiccan access to sweat lodges is supported by compelling governmental interests, it is not dispositive of this issue.

The court finds Plaintiff has presented evidence that creates a genuine dispute of material fact remains as to whether AR 810's ban on Wiccan access to the sweat lodge is supported by compelling governmental interests that are the least restrictive means of furthering those interests.

The fact of the matter is that it is undisputed that the Native Americans are still permitted to utilize the sweat lodge in practicing their religion. While Defendants have attributed this to the unique nature of the Native Americans as sovereign citizens who have entered into treaties with the federal government (*see* Nash Holmes Decl. at Doc. # 123-3 at 5 ¶ 14)[6], the same safety and security risks attendant to the Wiccans' use of the sweat lodge presumably exist equally with respect to the Native Americans' use of the sweat lodge.

Therefore, in one manner or another, these safety and security risks are being addressed by the institution when Native Americans utilize the sweat lodge. This in and of itself creates a genuine issue of material fact as to whether the absolute prohibition on use of the sweat lodge by the Wiccans is supported by compelling government interests and that

---

[6]She states: "Native Americans have the unique status of being parties to treaties between the Indian Nations and the United States government. Federal statutes and case law have defined the individual, cultural and religious practices of Native Americans. Those recognized rights carry over to Native American inmates in prisons. NDOC has sought to afford Native American inmates the ability to engage in their traditional cultural and religious practices, to the extent we are able to do so, consistent with health, safety, security and management concerns of our prisons. Other earth-based religions are not protected by the same treaties, federal statutes and case law that apply to Native Americans."

1    the prohibition on Wiccan access in AR 810 is the *least* restrictive means of furthering the

2    safety and security interests advanced by Defendants. The fact that members of another

3    faith group are allowed to utilize the sweat lodge despite safety and security concerns that

4    would seemingly apply to any faith group of inmates is some evidence that the absolute

5    prohibition on the Wiccan use of the sweat lodge may not be the least restrictive means of

6    furthering those interests.

7        Additionally, Plaintiff has presented evidence in his declaration that prior to AR

8    810's implementation in 2004, Wiccans were permitted to build a sweat lodge at medium

9    security facilities, and apparently did so on the grounds of at least one facility, at their own

10   cost, and were permitted to utilize the sweat lodge. (Doc. # 146 at 17, 19.) Defendants do not

11   address this fact. Nor do Defendants identify any specific incidents that arose during the

12   period of time when the Wiccan inmates were permitted to utilize the sweat lodge which

13   would justify the change in policy on this issue and demonstrate the ban on Wiccan access

14   to the sweat lodge is the least restrictive means of furthering the interests they have

15   advanced.

16       Plaintiff also raises an issue about whether or not it would actually take more

17   manpower to allow Wiccans to participate in the sweat lodge experience. (Doc. # 146 at 12.)

18   He contends that each institution already has search and escort officers whose primary duty

19   it is to oversee the escorts that may be required during their daily shift, and who escort

20   inmates to and from every religious activity at the chapel. (*Id.*) Therefore, he implies that

21   the absolute prohibition on Wiccan access to the sweat lodge may not be advanced by the

22   least restrictive means.

23                          **v. Conclusion**

24       In sum, a genuine dispute of material fact exists as to whether AR 810's prohibition

25   on Wiccan access to the sweat lodge is supported by compelling governmental interests that

26   are the least restrictive means of furthering those interests.

27       Should evidence surface at trial that there were specific instances that sparked safety

28                                      20

and security concerns justifying an outright ban on Wiccan access to the sweat lodge, the fact-finder may well find in Defendants' favor. On the other hand, a fact-finder may determine no such justifications exist, and in light of the fact that Wiccans were previously allowed to utilize the sweat lodge, and that the Native Americans are still permitted to use the sweat lodge despite safety and security concerns that would seem to similarly apply to their use of the sweat lodge, that Plaintiff should prevail.

In light of these factual issues, the court recommends that Plaintiff's RLUIPA claim related to AR 810's prohibition on Wiccan access to the sweat lodge should proceed to trial, and Defendants' motion for summary judgment on this claim should be denied.

**3. Religious Property**

Defendants assert that the possession of religious property is governed by AR 810, and its "Faith Group Overview." (Doc. # 123 at 7, pointing to various versions of AR 810 set forth at Docs. # 123-1 at 1-55, # 123-2 at 1-64.) Column five of the "Faith Group Overview Chart" lists the allowable personal items an inmate may obtain and possess in pursuit of his faith. (Nash Holmes Decl. at Doc. # 123-3 at 3 ¶ 8.) Ms. Nash Holmes claims that the intent of these provisions of AR 810 is: "to provide inmates with a sufficient quantity and variety of religious or spiritual items to enable them to adequately practice their religion or spirituality on an individual or personal basis." (*Id.*) Inmates could freely purchase the permitted items on their own. (*Id.*) Limits on the number of items or types of items are derived from spatial and security concerns within the prisons. (*Id.*)

Defendants contend Plaintiff cannot demonstrate how the limitations on religious property in AR 810 impose a substantial burden on the exercise of his religious beliefs. (Doc. # 149 at 6.) Instead, Defendants assert that this restriction amounts to nothing more than a mere inconvenience, which is not actionable. (*Id.*) Notwithstanding, Defendants claim that the restrictions are supported by legitimate penological interests that have been implemented by the least restrictive means. (*Id.*)

Defendants claim that their restriction on possession of certain items is supported by

21

compelling government interests, including safety and security. (*Id*.) In support of this position, they point to the declarations of defendant Dorothy Nash Holmes and Deputy Director McDaniel. (Nash Holmes Decl. at Doc. # 123-3 at 2-9; McDaniel Decl. at Doc. # 123-3 at 11-18.) They state that correctional officers must be able to inspect an inmate's cell for contraband and have a predictable list of items which have been determined to be acceptable for possession by inmates. (Nash Holmes Decl. at Doc. # 123-3 at 25-26 ¶ 8; McDaniel Decl. at Doc. # 123-3 at 15 ¶ 10.) If an inmate is permitted to possess too many items, excessive personal property becomes a space-resource and safety issue. (Nash Holmes Decl. at Doc. # 123-3 at 26 ¶ 8; McDaniel Decl. at Doc. # 123-3 at 15 ¶ 10.) NDOC has more than 12,900 inmates, and as such there are also obvious cost considerations in having sufficient staff and resources to search for contraband and monitor excess property. (Nash Holmes Decl. at Doc. # 123-3 at 26 ¶ 8; McDaniel Decl. at Doc. # 123-3 at 15 ¶ 11.)

Defendants also assert that there are additional legitimate security concerns in permitting inmates to utilize certain items in their cells. (Nash Holmes Decl. at Doc. # 123-3 at 4 ¶ 9; McDaniel Decl. at Doc. # 123-3 at 16 ¶ 16.) Defendant Nash Holmes cites the risk that inmates who possess an excessive amount of property will either try to barter those items in exchange for favors or other property, or will be targeted by other inmates and have their property stolen. (Nash Holmes Decl. at Doc. # 123-3 at 4 ¶ 9.) They also provide the several other examples to make their point. If an inmate is allowed to burn incense, it could mask the odor of contraband drugs or inmate-made alcohol. (Nash Holmes Decl. at Doc. # 123-3 at 4 ¶ 10; McDaniel Decl. at Doc. # 123-3 at 16 ¶ 16.) A wand, used in certain earth-based religions could be used as a weapon. (Nash Holmes Decl. at Doc. # 123-3 at 4 ¶ 10; McDaniel Decl. at Doc. # 123-3 at 16 ¶ 16.) The unsupervised burning of candles could lead to fires in a cell, or could be used to assist an inmate in using certain drugs, not to mention the fact that lit objects could be used as weapons. (Nash Holmes Decl. at Doc. # 123-3 at 4 ¶ 10.)

This will be addressed again below, but all prison faith groups are restricted to using

22

baby oil as anointing oil because according to Defendants, some groups claim the need to use specially-scented oils that may contain ingredients not readily identifiable by officers, and may be able to mask the use of drugs. (Nash Holmes Decl. at Doc. # 123-3 at 4 ¶ 11; McDaniel Decl. at Doc. # 123-3 at 16 ¶ 15.)

Inmates are permitted to use additional property in a group setting as part of their faith group that is not allowed in their own cells. Defendants assert that this allows faith groups to exercise their religion in both an individual setting and group setting, safely and within the reasonable means of NDOC. (Nash Holmes Decl. at Doc. # 123-3 at 4 ¶ 12; McDaniel Decl. at Doc. # 123-3 at 15 ¶ 14.)

Based on these considerations, they assert that the limitation of religious property under AR 810 advances compelling government interests and is accomplished in the least restrictive manner possible. (Doc. # 123 at 8.)

Defendants have put forth evidence that Plaintiff is permitted to obtain religious property items, with some reasonable limitations on the number or amount of items that may be possessed. Plaintiff generally implies this is not sufficient because the provider used by NDOC for religious items charges more than a previous provider. Defendants have provided evidence that this is not in fact the case. In any event, even if Plaintiff could show this was true, he has not provided evidence that this has prevented him from obtaining religious property items to practice his religion. Moreover, RLUIPA does not require the prison "to pay for an inmate's devotional accessories." *Cutter*, 544 U.S. at 720, n. 8 (citation omitted).

In addition, Defendants have advanced compelling government interests to support the limitations placed on the amount of certain items such as the ability to expeditiously perform a cell search for contraband, to avoid altercations that might result if an inmate acquired too many items, and various justifications for limitations on the amount of other items an inmate may possess. There is no outright ban on these  items, and as such Defendants have set forth evidence that this is the least restrictive means of effectuating

23

1   these restrictions. Plaintiff has not refuted this.

2       Therefore, summary judgment should be granted in Defendants' favor as to

3   Plaintiff's RLUIPA claim regarding AR 810's limitations on religious property.

4       **4. Cooking meals on Wiccan Religious Grounds with Free Raw Foods**

5       Next, Defendants argue that Plaintiff cannot demonstrate that prohibiting him from

6   utilizing raw food in preparation of a meal over a fire on Wiccan grounds has substantially

7   burdened his religious exercise. (Doc. # 123 at 8-10.)

8       NDOC does not permit inmates of any religious faith group to cook raw food items as

9   a part of their religious worship or celebration. (McDaniel Decl. at Doc. # 123-3 at 16 ¶ 17.)

10  Defendants contend that Plaintiff can purchase food from the prison canteen to take to the

11  Wiccan grounds. (Doc. # 123 at 9, McDaniel Decl. at Doc. # 123-3 at 16 ¶ 17.)

12      Defendants contend that the prohibition on possession of raw food for religious

13  ceremonies does not substantially burden Plaintiff's religious exercise. (Doc. # 13 at 9.)

14  They further contend that the prohibition on raw food serves a compelling government

15  interest. (*Id.*) According to Defendants, the Wiccan grounds do not have a sink for hand

16  washing or utensils or cookware, and during the religious ceremony, NDOC would not be

17  able to ensure the meals were prepared in a safe and sanitary manner. (*Id.*; McDaniel Decl.

18  at Doc. # 123-3 at 16 ¶ 18.) NDOC culinary facilities are supervised by NDOC employees and

19  subject to inspections to ensure proper food handling and to minimize risks of food-borne

20  illness. (Doc. # 123 at 9.) Providing inmates with tools necessary to cook a meal presents

21  additional safety and security concerns. (*Id.*) Moreover, raw ingredients such as rice or

22  other grains can be fermented and turned into prison-made alcohol. (*Id.*) Defendants also

23  cite the risk of food tampering or the unfair distribution of food which may lead to physical

24  altercations among inmates. (*Id.* at 10.) They point out that NDOC utilizes a "blind service"

25  method of food service where individuals serving meals cannot see who is receiving the

26  food, reducing the risk of food tampering or harm to a particular inmate. (*Id.*)

27

28

In their reply, Defendants claim Plaintiff has not shown how this prohibition is more than a mere inconvenience. (Doc. # 149 at 7.) They also contend that this prohibition is supported by compelling government interests, and is administered by the least restrictive means possible. (*Id.*)

The fatal defect in this claim, as compared to the sweat lodge claim, is that there is no evidence before the court that the prohibition on raw food and cooking during rituals substantially burdens Plaintiff's religious exercise. While Plaintiff states that Wiccans cook and prepare meals that are shared among the group during rituals (Doc. # 146 at 20), he does not address how the inability to use raw food and actually prepare his own food during the ritual affects his religious exercise or state that it is necessary to achieving a religious experience. Nor does he address why it is insufficient to take meals prepared by the prison culinary to the ritual.

Therefore, summary judgment should be granted in Defendants' favor as to Plaintiff's RLUIPA claim related to cooking during rituals and the use of raw food items to do so.

### 5. Anointing Oils

Defendants argue that limiting Plaintiff's use of anointing oil to the purchase of baby oil, as is required for all religious groups seeking to acquire anointing oil, does not substantially burden his religious exercise. (Doc. # 123 at 10.)

Defendants assert that they permit religious faith groups to engage in the spiritual practice of using anointing oil by purchasing a small bottle of baby oil from the prison canteen. (Doc. # 123 at 10; Nash Holmes Decl. at Doc. # 123-3 at 4 ¶ 11; McDaniel Decl. at Doc. # 123-3 at 16 ¶ 15.) Allowing inmates to use specially-scented oils may mask the use of drugs by an inmate. (*Id.*) Defendants contend the restriction is thus supported by a legitimate, compelling security concern. (Doc. # 123 at 11.)

Defendants argue in their reply that Plaintiff has failed to demonstrate that the baby

1   oil available for purchase from the prison canteen instead of another oil preferred by

2   Plaintiff constitutes a substantial burden on his religious exercise. (Doc. # 149 at 8.)

3       In fact, the memorandum of Chaplain Jane Foraker-Thompson, *submitted by*

4   *Plaintiff in support of his opposition*, states that in her experience and as demonstrated by

5   her research, the baby oil alternative is sufficient as any religion can apply their religious

6   rites to the oil to make it suitable for their purposes. (*See* Doc. # 146-1 at 7-11.)

7       The court finds that Plaintiff provides no evidence to that not being allowed to have

8   other oils specifically burdens his religious exercise. Therefore, summary judgment should

9   be granted in Defendants' favor on this claim.

10      **6. Individual Use of Herbs, Incense, and Candles Versus Group Use**

11      Plaintiff asserts that his rights under RLUIPA are violated by AR 810's restriction on

12  certain religious items that are only permitted for use by a group. He asserts that limiting

13  certain items, such as candles, herbs, and incense, to group use only, imposes a substantial

14  burden on his ability to exercise his religion.

15      Defendants argue that this restriction does not substantially burden Plaintiff's ability

16  to exercise his religion, and even if it did, it is supported by compelling government

17  interests and is the least restrictive means for furthering those interests. (Doc. # 123 at 11-

18  12.)

19      Defendants assert that Plaintiff is not deprived of using these items for religious

20  observance, but is restricted to using them in a group setting where the legitimate safety

21  and security concerns associated with the items can be monitored and minimized. (Doc. #

22  123 at 11; Nash Holmes Decl. at Doc. # 123-3 at 4-5 ¶ 12; McDaniel Decl. at Doc. # 123-3 at

23  15-16 ¶¶ 14, 19, 20.)

24      If incense or candles were permitted to be burned in individual cells, they could

25  cause a fire if left unattended, obscure the smell of drugs or prison-made alcohol, and

26  objects on fire could be used as a weapon. (Doc. # 123 at 11; Nash Holmes Decl. at Doc. #

27  123-3 at 4 ¶ 10; McDaniel Decl. at Doc. # 123-3 at 16 ¶¶ 16, 20.) Herbs could be confused

28

26

with illegal substances, or illegal substances could be confused with permitted herbs or edible plants. (McDaniel Decl. at Doc. # 123-3 at 17 ¶ 20.) In addition, items like wands and cauldrons can be used as weapons. (Doc. # 123 at 11; McDaniel Decl. at Doc. # 123-3 at 16-17 ¶¶ 16, 20.)

In their reply, Defendants argue Plaintiff has not established that the limitation on access and use of certain items to a group setting only (as compared to use in the individual setting) substantially burdens the exercise of his faith.

The court agrees that Plaintiff has not established that the restriction on certain items to group use only substantially burdens his ability to exercise his religion. Defendants have also set forth compelling government interests for this limitation, *i.e.*, burning incense in the cell might mask the odor of drugs or prison-made alcohol, herbs might be mistaken for contraband drugs or vice versa, candles pose a danger of fire and can be used as a weapon. Defendants have likewise satisfactorily demonstrated that this is the least restrictive means of administering this limitation, as the items were not subject to an outright ban. Plaintiff has not presented evidence to refute these contentions. Plaintiff merely states that he wants to make sure an individual using one of these items at a group ritual will not be punished. (Doc. # 146 at 21.) This misses the point of RLUIPA, which precludes the government from substantially burdening one's ability to exercise his or her chosen faith.

Therefore, summary judgment should be granted in Defendants favor on Plaintiff's RLUIPA claim related to the individual use of certain items designated for group use only.

**7. Limitations on Religious Materials**

Plaintiff alleges that AR 810 limits his access to religious, studying and teaching materials.

Defendants argue that Plaintiff fails to assert how AR 810 substantially burdens his religious exercise in this regard. (Doc. # 123 at 12.) They point out that AR 810 and AR 711.1 permit inmates to possess ten personal books, including legal and religious books. (*Id.*,

1   citing AR 810's religious practice manual at Doc. # 123-2 at 25 ("Inmates are allowed to

2   possess individual and group religious property as provided in the Faith Group

3   Overview...") and NDOC AR 711, Inmate Property Manual, effective October 27, 2011 at

4   Doc. # 123-4 at 26.)

5         Defendants further claim that all of Plaintiff's requests for religious texts have been

6   approved, with the exception of one, when he requested books that were not in paperback

7   form. (Doc. # 123 at 12; religious text requests at Doc. # 123-4 at 32-36.) However, AR 810

8   provides a procedure for inmates to obtain hardbound religious books. (Doc. # 123 at 12;

9   Doc. # 123-2 at 29.)[7] Defendants represent there is no evidence Plaintiff submitted a

10  property request form seeking personal possession of a book only available in hardbound

11  format. (Doc. # 123 at 12.)

12        In their reply, Defendants point out that Plaintiff failed to respond to the evidence

13  Defendants presented in their motion that Plaintiff's requests for religious texts have all

14  been approved, except when he asked for hardbound materials, and he never followed

15  NDOC's procedure for obtaining the text of these hardbound books.

16        The court agrees with Defendants' analysis of this claim. They have presented

17  evidence that Plaintiff's ability to exercise his religion has not been substantially burdened

18  by AR 810's limitation on hardbound religious books. In fact, his requests for religious texts

19  have been approved, save for requests for hardbound materials. It is his own failure to

20  follow NDOC's procedures for obtaining the texts of those materials that resulted in any

21  religious deprivation, and he did not bother to address this claim in his opposition.

22        Accordingly, summary judgment should be granted in Defendants' favor on his

23  RLUIPA claim related to his access to religious texts and materials.

24  ///

25  _____

26  [7]The inmate is required to complete a NDOC religious property request form, and it must be confirmed that the text is only available in hardbound format. It must also be confirmed that the text is an important part of the inamtes' religious practice and other alternatives do not exist. Chaplain and Warden approval are required. Then the cover is removed before the inmate may possess the book.

27

28

1          **8. Pursuit of Medicinal Practice**

2          Defendants argue that NDOC is tasked with providing medical care to inmates. (Doc.

3    # 123 at 13; McDaniel Decl. at Doc. # 123-3 at 17 ¶ 21.) To the extent Plaintiff seeks to

4    acquire herbs for medicinal purposes, Defendants assert that he can purchase certain

5    approved herbs from the prison canteen. (Doc. # 123 at 13; Doc. # 123-3 at 28-44.)[8]

6          Defendants contend that NDOC restricts the possession of non-approved herbs

7    based on legitimate safety and security concerns. (Doc. # 123 at 13.) NDOC does not provide

8    "herbal medicine" as an alternative to traditional medicine, and some herbs may cause

9    health problems if consumed in conjunction with other medication. (McDaniel Decl. at Doc.

10   # 123-3 at 17 ¶¶ 22-23.)

11         As such, Defendants contend Plaintiff cannot establish the restriction on herbs for

12   medicinal practice substantially burdens Plaintiff's religious exercise, and even if it did, the

13   restriction is supported by compelling safety interests, and is the least restrictive means of

14   furthering those interests because Plaintiff may purchase NDOC-approved herbs. (Doc. #

15   123 at 13.)

16         Defendants argue that Plaintiff has not demonstrated how the alleged inability to

17   participate in herbal and spiritual medicine imposes a substantial burden on his ability to

18   practice his religion. (Doc. # 149 at 10.)

19         Plaintiff did not respond to Defendants' argument on this claim. The court therefore

20   agrees with Defendants that Plaintiff has not satisfied his initial burden of establishing that

21   the inability to participate in herbal and spiritual medicine substantially burdens his ability

22   to participate in a religious exercise. Therefore, summary judgment should be granted in

23   Defendants' favor on Plaintiff's RLUIPA claim based on AR 810's restriction on an alleged

24   ability to pursue medicinal or spiritual medicine.

25   ///

26   _____

27         [8]This exhibit contains the Union Supply catalog of religious items approved by NDOC, which shows that certain herbs are available for purchase by inmates. (*See*, *e.g.*, Doc. # 123-3 at 36, 43-44.)

28

1

### 9. Use of Open Fire

2    Defendants state that AR 810 now permits pagan groups to burn a small fire at their

3  place of worship, so this claim is moot. (Doc. # 123 at 15; Doc. # 123-2 at 22.)

4    Plaintiff argues this issue is not moot because Defendants may reinstate the absolute

5  ban on fires at any time.

6    In his complaint, Plaintiff sought declaratory and injunctive relief as well as general

7  compensatory damages. (Doc. # 6 at 14.) However, the claims for civil damages were

8  dismissed when the court determined, and the Ninth Circuit affirmed, that the individual

9  defendants were entitled to qualified immunity. While Plaintiff generally states that

10  Defendants may reinstate the absolute ban on fires, he provides no evidence to this effect.

11  Accordingly, the court finds that this claim is moot, and summary judgment should be

12  granted in Defendants' favor.

13

### 10. Acquisition and Cultivation of Edible Herbs

14    Plaintiff alleges that AR 810 violates RLUIPA because it prohibits him from growing

15  edible plants and herbs on prison grounds.

16    Defendants assert that this prohibition does not substantially burden Plaintiff's

17  religious exercise, as their research reveals that a Wiccan may still worship and practice his

18  or her beliefs without personally growing edible plants. (Doc. # 123 at 15; Nash Holmes

19  Decl. at Doc. # 123-3 at 7 ¶ 25.)

20    Even if Plaintiff could establish this prohibition substantially burdened his religious

21  exercise, Defendants contend that it is supported by compelling government interests and

22  AR 810 is the least restrictive means of furthering those interests. (Doc. # 123 at 15-16.)

23  Defendants claim that they prohibit growing plants because the gardens have been used by

24  inmates to hide contraband, such as drugs and weapons, and to grow marijuana. (*Id*. at 15;

25  Nash Holmes Decl. at Doc. # 123-3 at 7 ¶ 25.) It also creates a safety and security concern

26  because it creates a place where inmates may hide their activities from supervising officers.

27  (*Id*.)

28

1  Nonetheless, AR 810 has since been revised, and Wiccan faith group members are

2  permitted to plant NDOC approved vegetation on their religious grounds, but the plants

3  may not be edible. (Doc. # 123 at 15; Doc. # 123-2 at 22 ("Earth-based practitioners may

4  only plant Department-approved vegetation obtainable via Canteen Services at the groups'

5  expense. No edibles of any kind…"); McDaniel Decl. at Doc. # 123-3 at 17 ¶ 25.) Reasons for

6  the prohibition on edible plants include the risk that inmates could grow poisonous plants

7  or those that present other health risks. (Doc. # 123 at 16.) Inmates may still purchase

8  edible plants and herbs for religious purposes through the canteen. (McDaniel Decl. at Doc.

9  # 123-3 at 17 ¶ 25.)

10  Defendants argue Plaintiff has not demonstrated the prohibition against growing

11  *edible* plants and herbs is a substantial burden on the exercise of his religious faith. (Doc. #

12  149 at 11.)

13  AR 810 has apparently been revised to allow earth-based faiths to grow plants.

14  Therefore, the issue remaining is the prohibition against growing *edible* plants. Plaintiff

15  does not address how this prohibition substantially burdens his religious exercise in light of

16  the fact that he is able to procure edible herbs through the prison canteen. The court has

17  already addressed Plaintiff's argument that the prices are higher for these items than they

18  once were. Again, Plaintiff presents no evidence that  even if this is true it has made it

19  impossible or impractical for him to obtain the items he needs to participate in a religious

20  exercise.

21  With no evidence that this restriction substantially burdens Plaintiff's ability to

22  exercise his religion, summary judgment should be granted in Defendants' favor as to

23  Plaintiff's RLUIPA claim related to the acquisition and cultivation of edible plants and

24  herbs.

25  **11. Work Proscription Days**

26  Plaintiff alleges that as a Wiccan he should be entitled to work proscription

27  days—which is the ability to take a day off from work without pay, but without the risk of

28  31

1 being terminated from the job. (Doc. # 6 at 7.)

2 Defendants assert that certain religions are provided work proscription days because
3 of the tenants of their faith which prohibit all forms of labor on certain days. (Doc. # 123 at
4 16; Decl. of Chaplain Calderin at Doc. # 123-4 at 3 ¶¶ 7-8; McDaniel Decl. at Doc. # 123-3 at
5 17-18 ¶¶ 26-27.) Under AR 810, a work prescription day is not intended to specify an unpaid
6 day off from prison employment, but a day where, based on the fundamental tenants of an
7 inmate's religious faith, he or she is permitted to be excused from certain "labor." (Decl. of
8 Chaplain Calderin at Doc. # 123-4 at 3 ¶ 9.)

9 Defendants contend there is no evidence Plaintiff has been denied the opportunity to
10 participate in Wiccan religious celebration due to a prison employment obligation.
11 NDOC Chaplain Calderin asserts that the Wiccan faith does not require work proscription
12 days like those mandated by some other faith groups, *i.e.*, Orthodox Jewish inmates'
13 religion mandates that no work be done on the Sabbath or Shabbat. (Doc. # 123 at 16; (Decl.
14 of Chaplain Calderin at Doc. # 123-4 at 4 ¶ 10.)

15 In addition, AR 810 recognizes certain Wiccan holidays. (Doc. # 123 at 17.) Saturday
16 is the day of the week designated for Plaintiff to participate in his Wiccan religious
17 observance. (*Id.*; Decl. of Chaplain Calderin at Doc. # 123-4 at 4 ¶ 11.) Plaintiff's regular
18 work days are Monday through Thursday. (Decl. of Chaplain Calderin at Doc. # 123-4 at 4 ¶
19 12.) If a recognized Wiccan holiday falls on a day other than Saturday, Chaplain Calderin
20 states that Plaintiff can seek to observe the holiday on another day, so long as it can be
21 coordinated with the other religious practitioners' scheduled worship day. (Decl. of
22 Chaplain Calderin at Doc. # 123-4 at 4 ¶ 13.) At the time he submitted his declaration, those
23 days are either Thursday or Friday. (Decl. of Chaplain Calderin at Doc. # 123-4 at 4 ¶ 14.) If
24 Plaintiff is scheduled to work during a recognized holiday, he could submit a request to the
25 chaplain to have a day off to participate in the religious activity. (Decl. of Chaplain Calderin
26 at Doc. # 123-4 at 4 ¶ 15.) To his knowledge, Plaintiff has not made such a request. (Decl. of
27 Chaplain Calderin at Doc. # 123-4 at 4 ¶ 16.)

28
32

1    Plaintiff has presented no evidence that he has been denied the ability to miss a day

2    of work in a prison job to attend a religious activity, so that substantial pressure was placed

3    on him to modify his behavior in violation of his beliefs. Nor does he address the Chaplain's

4    declaration stating that if a Wiccan holy day was to be celebrated on a day Plaintiff is

5    scheduled to work, he should submit a letter to the chaplain requesting permission to take

6    the day off of work to attend the religious activity. While he claims that AR 810 permits

7    work proscription days for inmates adhering to other religions (Doc. # 146 at 16), he does

8    not have an equal protection claim pending in this action, and this does nothing to establish

9    that *his* religious exercise has been substantially burdened as a result of AR 810's

10   implementation.

11   As a result, summary judgment should be granted in Defendants' favor as to

12   Plaintiff's RLUIPA claim related to work proscription days.

13   **C. Plaintiff's Motion for Summary Judgment (Doc. # 127)**

14   The court will now address Plaintiff's motion for summary judgment. (Doc. # 127.)

15   In his motion, Plaintiff argues that he is entitled to summary judgment on his

16   RLUIPA claim to the extent he asserts his rights are violated because Defendants preclude

17   the Wiccans from utilizing the sweat lodge because AR 810 is not the least restrictive means

18   for regulating this conduct. (Doc. # 127 at 2.) Plaintiff points out that Wiccans used to be

19   permitted access to the sweat lodge and Native Americans are still permitted access to the

20   sweat lodge. (*Id*.) Plaintiff asserts that there is physical space to accommodate the sweat

21   lodge at NDOC facilities and that NDOC can likewise accommodate the Wiccan members to

22   engage in this ritual. (*Id*. at 4.) Plaintiff's motion does not focus on any other aspect of his

23   RLUIPA claim, *i.e.* his access to incense, anointing oil, or herbs, fire, work proscription.

24   In opposing Plaintiff's motion, Defendants argue Plaintiff has not set forth evidence

25   to establish that their conduct substantially burdened the free exercise of his religion, and in

26   fact, their position that Plaintiff's desire to utilize a sweat lodge as part of his Wiccan faith

27   cannot be accommodated has been upheld by another judge in this district in *Fletcher v.*

28

33

1    *Whorton*, 2:06-cv-00818-PMP-GWF. (Doc. # 145.)

2       In his reply, Plaintiff argues that Defendants reliance on *Fletcher* is misplaced

3 because in that case the plaintiff failed to exhaust his administrative remedies, and that

4 opinion occurred prior to the Ninth Circuit's opinion in this case stating that Defendants

5 had not established that AR 810 is the least restrictive means of furthering their proffered

6 safety and security interests related to use of the sweat lodge. (Doc. # 150 at 1-2.) Next, he

7 states that he has always maintained that depriving him of use of the sweat house

8 substantially burdened his ability to practice his religion. (*Id*. at 3.) He asserts that he

9 should succeed on his motion because it is clear that Wiccans used the sweat lodge before

10 the enactment of AR 810. (*Id*.)

11       The court finds that Plaintiff has not met his burden and summary judgment should

12 not be granted in his favor on his claim that Defendants violated RLUIPA by precluding

13 Wiccan access to a sweat lodge. Plaintiff cannot prevail on his motion, because he has not

14 established the absence of a genuine issue of fact on each issue material to his case, and in

15 particular, as to whether AR 810 is the least restrictive means of furthering the Defendants'

16 proffered compelling interests. Plaintiff points out that Wiccans were able to utilize the

17 sweat lodge prior to AR 810's enactment and appears to therefore conclude that he should

18 prevail; however, this argument does not acknowledge the existence of a dispute regarding

19 whether AR 810's subsequent prohibition on this practice within NDOC is the least

20 restrictive means of furthering a compelling government interest.

21       In sum, it is recommended that Plaintiff's motion for summary judgment (Doc. #

22 127) be denied.

23 ///

24 ///

25 ///

26 ///

27 ///

28                           34

### IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an Order **DENYING** Plaintiff's motion for summary judgment (Doc. # 127) and **GRANTING IN PART AND DENYING IN PART** Defendants' motion for summary judgment (Doc. # 123) as follows:

(1) Defendants' motion for summary judgment on Plaintiff's RLUIPA claim related to AR 810's prohibition on access to the sweat lodge should be **DENIED**;

(2) Defendants' motion for summary judgment on Plaintiff's RLUIPA claim related to AR 810's limitations on religious property items should be **GRANTED**;

(3) Defendants' motion for summary judgment as to Plaintiff's RLUIPA claim related to cooking during rituals and the use of raw food items should be **GRANTED**;

(4) Defendants' motion for summary judgment on Plaintiff's RLUIPA claim related to the restriction on available anointing oils should be **GRANTED**;

(5) Defendants' motion for summary judgment on Plaintiff's RLUIPA claim related to the individual use of certain items designated for group use only should be **GRANTED**;

(6) Defendants' motion for summary judgment on Plaintiff's RLUIPA claim that AR 810 has limited his ability to access religious materials, texts  and teachings should be **GRANTED**;

(7) Defendants' motion for summary judgment on Plaintiff's RLUIPA claim based on AR 810's restriction on an alleged ability to pursue medicinal or spiritual medicine should be **GRANTED**;

(8)Defendants' motion for summary judgment on Plaintiff's RLUIPA claim related to the use of open fires by Wiccans should be **GRANTED**;

(9) Defendants' motion for summary judgment on Plaintiff's RLUIPA claim related to the acquisition and cultivation of plants and herbs (edible or otherwise) should be **GRANTED**; and

1    (10) Defendants' motion for summary judgment on Plaintiff's RLUIPA claim related

2  to work proscription days should be **GRANTED.**

3    The parties should be aware of the following:

4    1.    That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule IB 3-2 of

5  the Local Rules of Practice, specific written objections to this Report and Recommendation

6  within fourteen (14) days of receipt.  These objections should be titled "Objections to

7  Magistrate Judge's Report and Recommendation" and should be accompanied by points

8  and authorities for consideration by the District Court.

9    2.    That this Report and Recommendation is not an appealable order and that

10  any notice of appeal pursuant to Rule 4(a)(1), Fed. R. App. P., should not be filed until entry

11  of the District Court's judgment.

12    DATED: January 17, 2014.

13

14    _____

15    WILLIAM G.  COBB
   UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28                                    36